1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT
9                     EASTERN DISTRICT OF CALIFORNIA
10

11   KENNETH JAMES WEST,                    Case No. 1:22-cv-00172-KES-CDB  (HC)

12              Petitioner,                 **FINDINGS AND RECOMMENDATION
                                            TO DENY PETITION FOR WRIT OF
13        v.                                HABEAS CORPUS AND DECLINE TO
                                            ISSUE CERTIFICATE OF
14   RAUL MORALES,                          APPEALABILITY**[1]

15              Respondent.                 **14-DAY DEADLINE**

16                                          (Doc. 38)

17

18        On March 27, 2022, Petitioner Kenneth James West ("Petitioner"), a state prisoner

19   proceeding pro se, filed a Second Amended Petition for Writ of Habeas Corpus ("Petition").

20   (Doc. 38).  For the reasons set forth below, the undersigned recommends that the district court

21   deny the Petition and decline to issue a certificate of appealability.

22   **I.      PROCEDURAL AND FACTUAL BACKGROUND**

23        On May 21, 2018, a jury in the Fresno County Superior Court convicted Petitioner of

24   multiple sex offenses against minors.  (Doc. 20-5 at 2; *see* Doc. 47-1 at 174-86).[2]  The court

25   sentenced defendant to 165 years to life in prison.  (Doc. 20-5 at 2; Doc. 20-1).  Before appealing

26

27   [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule
     302(c)(17) (E.D. Cal. 2022).

28   [2] Record citations herein are to the CM/ECF-assigned pages.

1    his conviction, Petitioner filed a pro se petition for writ of habeas corpus in the state superior

2    court, which was denied on August 1, 2018.  (Docs. 47-10, 47-11).

3            On appeal, the Fifth Appellate District Court of Appeal summarized the pertinent facts of

4    the underlying offense:[3]

5                                        **FACTS**

6            Around the mid- to late-1990's, defendant lived off-and-on in a
        house in Squaw Valley with two brothers, Darrell and George.

7        Sometime between 1994 and 1996, defendant's girlfriend Gina
        moved into the house with her three children, including R.  In

8        approximately 1997, Darrell's girlfriend Ethel moved into the house
        with her two children, Melissa and T.  Soon thereafter, Gina and her

9        children moved out and left the area, and defendant began dating,
        and eventually married, Ethel's sister Charlene. The families later

10       moved into separate households but regularly spent time together.
        In 1999, Melissa's son C. was born.

11
            On March 14 or 15, 2015, the families held a gathering at Ethel's

12       house. While there, T. noticed that defendant and C. were absent for
        approximately 30 minutes. T. eventually saw defendant and C.

13       walking up to the house from a camper parked at the end of the
        property's long driveway. Because T. himself had been sexually

14       abused by defendant under similar circumstances, he grew
        suspicious that defendant also was abusing C.  A few days later, T.

15       revealed his own history of abuse to his mother and his sister
        Melissa, although he did not disclose any details. Melissa then

16       confronted her son C., who also acknowledged being abused by
        defendant, again without disclosing any details. Family members

17       eventually contacted Gina, who confronted R. R. acknowledged he
        too was abused, but did not disclose details to Gina.

18
            Each of the victims testified that, prior to these revelations, they had

19       not discussed the abuse with anyone, and they only provided details
        of the encounters to sheriff's deputies and in their trial testimony.

20
21       *I.  R.'s Testimony*

22           When R. was around eight years old, his mother began dating
        defendant. At that time, R.'s father was in prison, and R. had not

23       seen his father for six or seven years. Defendant took R. fishing,
        shooting, and camping. One day, while defendant and R. were

24       together in defendant's vehicle, defendant offered to pay R. $100 if
        R. would take off his clothes and run through an orchard. R.

25       thought this was a joke and did not do it.

26           R. and his mother and sisters eventually moved into the house
        defendant shared with Darrell and George in Squaw Valley. On one

27
    ──────────────
28   [3] These facts are entitled to a rebuttable presumption of correctness.  *See* 28 U.S.C. § 2254(e)(1);
    *Crittenden v. Chappell*, 804 F.3d 998, 1011 (9th Cir. 2015).

                                        2

occasion thereafter, defendant and R. went on a hike. When they stopped on the trail and sat down, defendant asked R. if he knew how to masturbate and whether he could ejaculate. R. explained that "it was worded . . . kind of like . . . that's what dads showed their boys was how to pleasure themselves." Defendant touched R.'s penis and said, "This is how you do it." Defendant eventually stopped and told R., "What goes on between us, you know, you can't tell your mom or anybody." The incident lasted 10 to 15 minutes.

Another incident occurred one to two weeks later. By that time, defendant and R.'s family had moved together to another home in Squaw Valley. R. and defendant were home by themselves when defendant came into R.'s room wearing only a shirt and underwear and told R. he wanted to show him "how to do some more stuff." Defendant sat down on R.'s bed and started touching R. under his clothes, and had R. touch him under his clothes. Defendant then orally copulated R. and had R. orally copulate him. Eventually, defendant stopped and told R. not to tell.

R. testified generally that at least 10 additional incidents of masturbation or oral copulation occurred over the course of one to two years. In one incident, defendant took R. and his older cousin fishing and, on the trip, masturbated the boys and had them masturbate themselves. Incidents involving R.'s cousin occurred on two or three occasions. Defendant also smoked marijuana with R. on one occasion and regularly gave R. beer at times when sexual incidents occurred.

Eventually, defendant and R.'s mother split up and R. and his family moved out of California.

***II. T.'s Testimony***

T. was nine years old when his parents divorced and he, his mother Ethel, and his sister Melissa moved in with Darrell in Squaw Valley. Also living in the home were Darrell's brother George, defendant, defendant's girlfriend Gina, and Gina's children, including R. Eventually, however, George moved out, as did Gina and her children. Defendant began dating T.'s aunt Charlene, who also moved into the house.

When T. and his family first moved in with Darrell, T. did not know Darrell and his mother were dating. When T. found out about the relationship, he was upset and defendant talked T. into going for a walk to calm down. Defendant then said something that made T. uncomfortable and touched T.'s thigh. On that occasion, nothing further occurred. Thereafter, T.'s relationship with Darrell was "a little closed off" and T. had animosity toward Darrell for being with his mother. T. had a relationship with his father but did not see him often. Defendant would regularly intervene when something was bothering T. and would suggest they take a walk. Often, this behavior was encouraged by other adults in the household.

As defendant continued to take T. on outings, the touching

3

progressed. On the next two to three outings, defendant touched only T.'s thigh.  On the third or fourth encounter, defendant touched T.'s penis over his clothes and asked whether he liked it. In future encounters, defendant touched T. under his clothes. On approximately five to 10 subsequent occasions, defendant only touched T.'s penis with his hand. Defendant would masturbate T. until he ejaculated. Eventually, defendant asked T. to masturbate him.  This occurred on 50 to 75 separate occasions. Later, when T. was 10 years old, defendant orally copulated him, and eventually had T. orally copulate defendant as well.

During the period that T. lived with defendant, the sexual acts described by T. occurred a few times each week amounting to hundreds of times. T. testified in specific detail regarding incidents on a trail behind the home and behind a rock on that trail, incidents in defendant's bedroom and bathroom, and an incident that occurred while pulled over on the roadway.

T. and his family moved out of the house when T. was 12 or 13 years old. T. testified that the sexual touching continued to occur thereafter. He testified in specific detail to an incident of masturbation and oral copulation that occurred when defendant visited the family's new home and took T. out to ride three-wheelers on a mountain behind the house. Approximately 100 to 200 incidents occurred on the mountain.

The sexual touching stopped when T. was 14 years old and defendant moved to Nevada.  T. visited defendant after the move, but refused to engage in further sexual acts. Defendant returned to Squaw Valley when T. was almost 18 years old but no further sexual touching occurred. T. and defendant pretended that nothing had ever happened and their relationship thereafter was "[p]retty normal."

Around 2015, T. began to suspect defendant was sexually touching his nephew C. He noticed on a few occasions when family was gathered that C. and defendant could not be found. The third time this occurred was on March 14 or 15, 2015, when the family was gathered at T.'s mother's house in Squaw Valley. On that occasion, defendant and C. were missing for approximately 30 minutes and people began calling out for them. T. saw C. and defendant returning from a camper trailer at the end of the driveway. T. was upset and drank until he passed out. He felt he needed to reveal what defendant had done to him so it would not continue.

A few days later, T. drove to his mother's house, where his family was gathered. T. asked his mother and sister Melissa to go with him for a drive, and told them in general terms what had occurred between himself and defendant. Melissa immediately began "flipping out" about C.  When they returned to the house, Melissa immediately left with C.  Later, Melissa called T. and confirmed in general terms that C. also had been abused by defendant. T. did not discuss any details of the abuse with C.

4

1

### III.  C.'s Testimony

C. had known defendant all his life.  Defendant would take C. to ride "quads" and they built things, such as a doghouse, together. C. was close with defendant.

C. estimated that defendant touched him sexually around 30 times, from the time C. was eight years old until he was 14 to 16 years old. C. testified in specific detail regarding several incidents, including an incident of oral copulation and masturbation that occurred when C. was eight years old and was out riding quads with defendant, an incident of masturbation that occurred when C. and defendant were riding quads at C.'s grandmother Ethel's house, an incident of oral copulation and masturbation that occurred in a camper trailer at Ethel's house, an incident of masturbation in a tool shed at defendant's house, and an incident of masturbation and oral copulation that occurred when C. was staying with defendant for a summer.  C. testified that multiple incidents occurred while out riding quads and while in the tool shed at defendant's house. The touching stopped when C. was 14 or 15 and told defendant he did not like the touching.

### IV.  Defendant's Admission to His Brother-in-Law

One day in 2015, Ethel called her brother James hysterical and crying and told him that defendant had molested T. and C.  James told Ethel to call their sister Charlene, who was also defendant's wife, to tell her what was going on.  Charlene then called James and stated that Ethel had reported defendant to the police. Charlene stated, "I can't believe it," and "my life's ruined."  James met Charlene in a neighborhood near her house, and she told him that defendant had denied everything.  However, while they were talking, Charlene received a phone call from defendant and told James, "He said he did it. He said he did it."

Moments later, defendant called again and James answered. Defendant told James "I molested them boys. I'm sick and I need help." Defendant also told James "I've been doing it for a long time. I'm sick and I need help." James told defendant to turn himself in.

Later that night, defendant texted Charlene and told her he was "getting out of there" because the "cops were coming."  James spoke with defendant and told him he needed to come back. A couple of hours later, James and Charlene met defendant in a nearby park. Defendant said he was sick and needed help. Defendant asked how much time James thought defendant would get.  After this conversation, Charlene told James she was going to leave defendant but needed to go home to retrieve her belongings. Later, she texted James to tell him she was going to stay with defendant to get him help. James did not talk to defendant or Charlene again after that day.

1

***V.  Expert Testimony***

2

An expert on Child Sexual Abuse Accommodation Syndrome
testified that children who have been sexually abused may keep the
abuse a secret and may delay reporting.

3

4

***VI.  Defense Case***

5

Three of defendant's neighbors testified that they knew defendant
to be honest and truthful.

6

7

Defendant testified on his own behalf. He testified that when
Charlene called him in March 2015 and told him of the accusations,
he drove home and saw her driving away. He then drove to Reno to
try to speak with one of Charlene's sisters, but she was not home.
He spent the night in his car. He spoke with his wife again the next
day, then returned home and found her there. He denied having any
contact with James, by telephone or in person, in relation to the
allegations of molestation in this case. He denied meeting with
James in a park.

8

9

10

11

12

Defendant acknowledged that he took C. and other children to ride
on quads in Squaw Valley. He denied having any sexual contact,
including physical touching or oral copulation, with R., T., or C.

13

14

Defendant testified that he had an altercation with Melissa on
March 14, 2015.

15

(Doc. 20-5 at 3-9 (footnotes omitted)).  The appellate court affirmed Petitioner's convictions.  (*Id.*

16

at 18).  On February 24, 2021, the California Supreme Court summarily denied review.  (*See* Doc.

17

20-7).

18

Petitioner filed his initial federal habeas petition on February 7, 2022.  (Doc. 1).  Because

19

the initial petition failed to identify any ground for relief, Petitioner was ordered to file an

20

amended petition, which he did on March 15, 2022.  (Docs. 12, 14).  Respondent moved to

21

dismiss the amended petition because the claims were unexhausted, and the Court ultimately

22

adopted the undersigned's recommendation that the motion be granted and the amended petition

23

dismissed without prejudice.  (Docs. 19, 27, 29).  Petitioner was provided 30 days from the date

24

of service of the order dismissing the amended petition to file a second amended petition.  (Doc.

25

29 at 3).

26

Before the time to file a second amended petition expired, Petitioner filed a motion to stay

27

the federal action so that he could exhaust his claims in the state courts.  (Doc. 30).  The Court

28

granted the unopposed motion on June 30, 2023.  (Doc. 33).

6

1      While the motion to stay the federal petition was pending, Petitioner returned to state

2   court, filing a state petition for writ of habeas corpus in the trial court on March 23, 2023.  (Doc.

3   47-12).  The court denied the petition on June 2, 2023.  (Doc. 47-13).  Petitioner subsequently

4   filed a petition for writ of habeas corpus in the Fifth Appellate District on July 5, 2023.  (Doc. 47-

5   14).  The appellate court denied the petition on July 19, 2023, noting that Petitioner failed to

6   provide a copy of the petition or order from the superior court and "failed to set forth his claims

7   for relief with adequate specificity."  (Doc. 47-15).  On October 20, 2023, Petitioner filed a

8   second petition in the Fifth Appellate District.  (Doc. 47-16).  The appellate court summarily

9   denied the petition on December 17, 2023.  (Doc. 47-17).  Petitioner filed a petition for review in

10  the California Supreme Court on January 10, 2024, and the court summarily denied review on

11  March 12, 2024.  (Docs. 47-18, 47-19).

12      Petitioner then returned to federal court, filing the instant Petition on March 27, 2024.

13  (Doc. 38).  The Petition initially raised three claims: (1) Petitioner was denied effective assistance

14  of counsel; (2) Petitioner received a "gross [and] unfair sentencing imposed by court;" and (3)

15  Petitioner was deprived of his rights under the Fourteenth Amendment in connection with the

16  state courts' treatment of the statute of limitations.  (*Id.* at 5, 7-8).  After reviewing the Petition,

17  the undersigned recommended dismissing the second and third claims with prejudice.  (Doc. 39 at

18  8-13).  The Court adopted the recommendation on December 19, 2024, leaving only Petitioner's

19  ineffective assistance claim pending in this action.  (Doc. 40 at 3-4).  On April 16, 2025,

20  Respondent filed an answer (Doc. 48), arguing Petitioner was not entitled to habeas relief, and

21  lodged the remainder of the state court record in support (Docs. 47, 47-1 through 47-19).[4]

22  Petitioner filed a traverse on May 7, 2025.  (Doc. 49).

23      After the traverse was filed, the Court received two documents purporting to be

24  declarations of Dan Cummings (Doc. 50, "Cummings Declaration") and Cherie West (Doc. 51,

25  "West Declaration"), making statements on behalf of Petitioner.  Respondent filed an opposition

26  to consideration of the declarations because "(1) the purported declarations are not properly

27

28  [4] Respondent initially filed portions of the state court record in support of the motion to dismiss.  (*See* Docs. 20, 20-1 through 20-7).

7

1    executed, (2) the purported declarations were not before the state court that denied relief on the

2    claims Petitioner presents here, and (3) Petitioner did not properly seek state court consideration

3    of the purported declarations."  (Doc. 52 at 1).  In response, the Cummings Declaration was

4    resubmitted with an electronic signature and the West Declaration was resubmitted with an ink

5    signature.[5]  (Docs. 53, 55).  Petitioner then filed an "Objection to Respondents motion opposing

6    declarations."  (Doc. 56).  Respondent filed a separate opposition to the new declarations on the

7    same grounds as the original declarations.  (Doc. 57).

8    ## II.    STANDARD FOR FEDERAL HABEAS RELIEF

9            A federal court's statutory authority to issue habeas corpus relief for persons in state

10   custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

11   Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

12   first "exhaust[t] the remedies available in the courts of the State."[6]  28 U.S.C. § 2254(b)(1)(A).

13   Where the state court adjudicates the claim on the merits, a petitioner is not entitled to habeas

14   relief unless the adjudication (1) "resulted in a decision that was contrary to, or involved an

15   unreasonable application of, clearly established Federal law, as determined by the Supreme Court

16   of the United States," or (2) "resulted in a decision that was based on an unreasonable

17   determination of the facts in light of the evidence presented in the State court proceeding."  28

18   U.S.C. § 2254(d).

19           "Deciding whether a state court's decision 'involved' an unreasonable application of

20   federal law or was 'based on' an unreasonable determination of the facts requires the federal

21   habeas court to 'train its attention on the particular reasons—both legal and factual—why state

22   courts rejected a state prisoner's federal claims."  *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

23   When the state court's decision "does not come accompanied with [its] reasons" for the decision,

24   a federal court "should 'look through' the unexplained decision to the last related state-court

25   decision that does provide a relevant rationale."  *Id.*  However, when there is no reasoned decision

26

27   [5] A second "affidavit" from Charlene West was also received, indicating that the documents were "not part
     of [Petitioner's] argumentation, this is my statement to the court."  (Doc. 54).

28   [6] The statute allows for limited exceptions inapplicable here.  *See* 28 U.S.C. § 2254(b)(1)(B).

to "look through," it may be presumed—in "the absence of any indication or state-law procedural principles to the contrary"—that the state court adjudicated the claim on the merits and the petitioner must show "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98-99 (2011).

Under 2254(d)(1), a decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle but applies the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 62 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "State courts are accorded substantial deference. If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." *Marks v. Davis*, 106 F.4th 941, 949 (9th Cir. 2024) (citations and quotation marks omitted) (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)).

1    **III.    ANALYSIS**

2    In his only remaining ground, Petitioner alleges he received ineffective assistance of

3    counsel because (1) counsel failed to properly object to the statute of limitations; (2) counsel

4    mishandled witnesses by failing to call favorable defense witnesses, call an expert witness, or

5    adequately cross exam the prosecution's witnesses; and (3) counsel had a conflict of interest

6    evidenced by comments he made to Petitioner's wife.  (Doc. 38 at 100-03).  As outlined below

7    with respect to each claim, Petitioner raised his claims in two separate state habeas petitions in the

8    superior court, and both petitions were denied.  (*See* Docs. 47-10 through 47-13).  While

9    Petitioner filed similar petitions in the state appellate and supreme courts, both those courts

10   summarily denied review.  (*See* Docs. 47-17, 47-19).  Accordingly, the Court looks through the

11   unexplained decisions to the superior court rulings to determine whether they are contrary to, or

12   based on an unreasonable application of, Supreme Court precedent or based on an unreasonable

13   determination of the facts.  *See Howard v. Clark*, 608 F.3d 563, 568 (9th Cir. 2010) ("Since the

14   California Court of Appeal and Supreme Court summarily denied [petitioner's] subsequent

15   habeas petitions, we must consider the superior court's reasoning in conducting the deferential

16   review required by 28 U.S.C. § 2254(d)(1).").

17   **A.  Standard for Ineffective Assistance Claims**

18   A claim of ineffective assistance of counsel is evaluated under the two-prong test set out

19   in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under this test, "a petitioner must prove: (1)

20   that his counsel's performance fell below an objective standard of reasonableness (the deficient

21   performance prong); and (2) that there is a reasonable probability of a more favorable outcome if

22   counsel performed effectively (the prejudice prong)."  *Rogers v. Dzurenda*, 25 F.4th 1171, 1181

23   (9th Cir. 2022) (citing *Strickland*, 466 U.S. at 687-88, 694).  While a petitioner must prove both

24   prongs to be entitled to relief, "a court need not determine whether counsel's performance was

25   deficient before examining the prejudice suffered by the defendant as a result of the alleged

26   deficiencies."  *Strickland*, 466 U.S. at 697.

27   To satisfy the deficient performance prong, "the petitioner must show that counsel made

28   errors so serious that they were not functioning as the counsel guaranteed the defendant by the

Sixth Amendment." *Rogers*, 25 F.4th at 1181 (quotations and alterations omitted). "Because even the best criminal defense attorneys would not defend a particular client in the same way, leeway must be allowed for tactical decisions at trial. Courts must also adopt counsel's perspective at the time of the challenged conduct to avoid the distorting effects of hindsight." *Id.* "The prejudice prong focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Id.* at 1182. In making this assessment, a reviewing court must "compare the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Hernandez v. Chappell*, 923 F.3d 544, 551 (9th Cir. 2019).

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted). Thus, "[f]ederal courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were unreasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### B. Counsel's Failure to Challenge the Statute of Limitations

Petitioner first alleges his counsel rendered ineffective assistance when he failed to challenge the application of the statute of limitations for the charged offenses. (Doc. 38 at 100).

### 1. Background

Petitioner first raised his challenge to counsel's failure to object to the statute of limitations in his second state habeas petition. (Doc. 47-12 at 3). Petitioner also argued the trial court abused its discretion in allowing the case to be brought after the statute of limitations expired. (*Id.* at 4). The superior court rejected Petitioner's challenge to the statute of limitations, explaining:

> [I]n determining the maximum sentence for a violation of a statute, the court must take into account any alternative sentencing schemes for a violation of a statute that the prosecution has charged. Penal Code section 667.61 is an alternate penalty scheme that, when charged, defines the length of imprisonment for the substantive offense of violating Penal Code section 288, subdivision (a). (*See People v. Perez* (2010) 182 Cal. App. 4th 231, 239.)

11

1

2          The former Penal Code section 667.61 provided that a person who
3      was convicted "in the present case or cases" for violations of Penal
       Code section 288, subdivision (a) against more than one victim
       "shall be punished by imprisonment in the state prison for life and
4      shall not be eligible for release on parole for 15 years." (Former
       Penal Code, § 667.61, subds. (b), (c)(7), and (e)(5) [Added by Stats.
5      1993-94, 1st Ex.Sess., c. 14 (S.B. 26), § 1, eff. Nov. 30, 1994].) As
       petitioner was charged with counts 1, 2, and 9 through 12 for
6      violating Penal Code section 288, subdivision (a), the counts dealt
       with three different victims, and the prosecution alleged that Penal
7      Code section 667.61 applied to all counts, the court finds that
       counts 1, 2, and 4 through 12 were subject to the alternative
8      sentencing scheme created in Penal Code section 667.61. Therefore,
       while violations of Penal Code section 288, subdivision (a) are
9      generally subject to a maximum 8-year prison term, in this case,
       since counts 1, 2, and 4 through 12 were subject to the alternative
10     sentencing scheme created in Penal Code section 667.61, subd. (b),
       the maximum sentence that could have been imposed for counts 1,
11     2, and 4 though 12 was a 15-year-to-life prison term. (Former Penal
       Code, § 667.61, subds. (b), (c)(7), and (e)(5) [Added by Stats.
12     1993-94, 1st Ex.Sess., c. 14 (S.B. 26), § 1, eff. Nov. 30, 1994].)

13         Penal Code § 805(a) provides that, for the purpose of determining
       the applicable statute of limitations, "[a]n offense is deemed
14     punishable by the maximum punishment prescribed by statute for
       the offense, regardless of the punishment actually sought or
15     imposed." Consequently, pursuant to Penal Code section 805,
       subdivision (a), Penal Code section 799 actually sets out the statute
16     of limitations applicable to counts 1, 2, and 4 through 12:
       "Prosecution for an offense punishable by death or by
17     imprisonment in the state prison for life … may be commenced at
       any time."

18         Accordingly, under the terms of Penal Code section 799, the
19     prosecution of counts 1, 2, and 4 through 12 "may be commenced
       at any time." Hence, when the prosecution of counts 1, 2, and 4
20     through 12 commenced on August 15, 2015, those counts were not
       barred by the applicable statute of limitations. Moreover, this court
21     notes that counts 15 and 16 were not time-barred when the felony
       complaint was filed.  Consequently, petitioner's first claim fails to
22     state a prima facie case for relief.

23     (Doc. 47-13 at 3-4).

24         In addressing the ineffective assistance of counsel claims, the court noted that Petitioner

25     had filed a previous petition challenging counsel's performance but not raising the challenge to

26     the statute of limitations.  (*Id.* at 4).  The court explained that under the *Miller* rule, "a petition for

27     habeas corpus based on the same grounds as those of a previously denied petition will itself be

28     denied where there has been no change in the facts or law substantially affecting the rights of the

1   petitioner." (*Id.* (quoting *In re Reno*, 55 Cal. 4th 428, 496-97 (2012))).  Additionally, "the

2   *Clark/Horowitz* rule bars 'newly presented grounds for relief which were known to the petitioner

3   at the time of a prior collateral attack on the judgment.'" (*Id.* at 4-5 (quoting *In re Clark*, 5 Cal.

4   4th 750, 768 (1993))).  The court concluded that Petitioner had not established that his ineffective

5   assistance claims were based on newly discovered evidence or that a law applicable to his claims

6   changed since his previous petition; had not adequately explained why he failed to raise his

7   claims in his prior petition; and failed to demonstrate that his claims fell under one of the four

8   narrow *Clark* exceptions.  (*Id.* at 5).  Accordingly, Petitioner's ineffective assistance claims were

9   "barred pursuant to either the *Miller* rule or the *Clark/Horowitz* rule." (*Id.*).

10         **2.  Federal Habeas Analysis**

11      Based on the superior court's finding that Petitioner's ineffective assistance claims were

12   barred, Respondent argues the challenge to counsel's failure to raise the statute of limitations is

13   procedurally defaulted.  (Doc. 48 at 15-17).  Regardless, Respondent argues the claim fails on the

14   merits because this Court cannot disagree with the superior court's analysis and conclusion that

15   "the California statute of limitations did not bar any of the charges upon which Petitioner was

16   convicted," and based on this conclusion "a fairminded jurist could conclude Petitioner could not

17   prove either deficient performance or prejudice." (*Id.* at 17).

18      In his traverse, Petitioner argues Respondent waived any argument that his claims were

19   procedurally barred by failing to oppose his motion for a stay in the federal proceedings.  (Doc.

20   49 at 1-2).  Petitioner does not otherwise address the merits of this particular ineffectiveness

21   claim.

22      "A federal habeas claim is technically exhausted but procedurally defaulted if the state

23   court declined to address the claim based on independent and adequate state procedural grounds."

24   *Rodney v. Garrett*, 116 F.4th 947, 954 (9th Cir. 2024) (citing *Coleman v. Thompson*, 501 U.S.

25   722, 729-32 (1991)).  For a claim to be procedurally defaulted, the state procedural rule relied on

26   must be "a nonfederal ground adequate to support the judgment" and be "firmly established and

27   consistently followed." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).  When a claim is procedurally

28   defaulted, a petitioner "must show that the default was excused in order for federal habeas review

to occur. In short, a petitioner can only obtain federal review of a defaulted claim by showing *cause* for the default and *prejudice* from a violation of federal law." *Leeds v. Russell*, 75 F.4th 1009, 1016 (9th Cir. 2023) (citation modified) (citing *Martinez*, 566 U.S. at 9-10). However, courts may exercise their discretion and deny a procedurally defaulted claim on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *Runningeagle v. Ryan*, 686 F.3d 758, 777 n.10 (9th Cir. 2012) (quoting 28 U.S.C. § 2254(b)(2)).

Here, Petitioner's claim is likely procedurally barred because the state habeas court cited the *Miller* rule in denying his claim, and the United States Supreme Court has concluded such a citation indicates reliance on California's firmly established and regularly followed timeliness rules for purposes of the procedural default analysis. *Walker v. Martin*, 562 U.S. 307, 310-11, 317 (2011). However, the Court need not address whether Petitioner has shown cause and prejudice to excuse the default because, even assuming the default can be excused, the claim fails on the merits as Petitioner cannot show ineffective assistance under the *Strickland* standard.

As the superior court explained, Penal Code § 805(a) provides that for purposes of determining the applicable statute of limitations, "[a]n offense is deemed punishable by the maximum punishment prescribed by statute for the offense, regardless of the punishment actually sought or imposed." Petitioner was charged with multiple counts of violating Penal Code § 288(a). While such offenses are typically punishable by imprisonment for three, six, or eight years, a person convicted of multiple violations of § 288(a) against more than one victim faces a potential life sentence. *See* Cal. Penal Code § 667.61(b), (c)(8), (e)(4). Penal Code § 799(a) provides prosecution for those offenses punishable by life imprisonment "may be commenced at any time." Because Petitioner was charged from the inception of the prosecution with multiple violations of Penal Code § 288(a) against multiple victims, there can be no genuine dispute that the maximum punishment was life in prison such that the charges could be brought at any time. It follows that counsel was not ineffectively deficient for failing to object on statute of limitations grounds. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 324 (1981) ("It is the obligation of any lawyer—whether privately retained or publicly appointed—not to clog the courts with frivolous

1    motions or appeals."); *Wooten v. Montgomery*, 815 F. App'x 124, 126 (9th Cir. 2020) (failure to

2    file meritless motion to suppress was not deficient performance to support ineffective assistance

3    habeas claim); *Juan v. Allen*, 408 F.3d 1262, 1273-74 (9th Cir. 2005) (habeas relief not warranted

4    on ineffective assistance claim based on failure to bring meritless objection to evidence).

5    Additionally, the superior court's analysis indicates any challenge to the statute of limitations

6    would have been unsuccessful, such that Petitioner cannot show prejudice from counsel's failure

7    to bring such a challenge.

8         Because Petitioner has not satisfied either *Strickland* prong for his statute of limitations-

9    based ineffectiveness claim, his claim necessarily fails.

10        **C. Counsel's Alleged Mishandling of Witnesses**

11        Petitioner next challenges counsel's handling of witnesses, alleging counsel failed to call

12    favorable witnesses, omitted expert testimony, and failed to adequately cross examine the victims.

13    (Doc. 38 at 100-02).

14            **1.  Background**

15        In his first state habeas petition, filed before his appeal, Petitioner alleged he received

16    ineffective assistance of counsel when his attorney failed to call various witnesses and when he

17    "called off" witnesses at trial.  (Doc. 47-10 at 3, 8-10).  The superior court denied Petitioner's

18    claim because "Petitioner failed to present any specific facts or evidence that would demonstrate

19    that his attorney's failure to call or question witnesses adversely impacted his criminal

20    proceeding."  (Doc. 47-11 at 2).  The court explained that "[w]hile Petitioner has attached a list of

21    witnesses that he believes that his attorney should have called at trial, he has failed to provide

22    specific facts or evidence that would demonstrate a reasonable probability that the outcome of his

23    criminal proceeding would have been more favorable had these witnesses testified at trial."  (*Id.*

24    at 3).  Petitioner raised similar claims that counsel did not cross examine witnesses or call

25    witnesses, including an expert witness, in his second state habeas petition.  (Doc. 47-12 at 3).

26    The court denied his petition with respect to those claims as either being successive or untimely.

27    (Doc. 47-13 at 4-5 (citing *In re Clark*, 5 Cal. 4th at 768 and *In re Reno*, 55 Cal. 4th at 496-97)).

28    ///

## 2. Federal Habeas Analysis

Respondent argues Petitioner's challenge to counsel's performance concerning witnesses fails because the state superior court rejected his claims and "[a] fairminded jurist could agree with the state superior court that Petitioner failed to point to specific evidence which an expert, a named potential witness, or even a testifying witness could have given that would have changed the outcome of trial." (Doc. 48 at 18 (footnote omitted)). Additionally, Respondent argues "the state court of appeal could also have concluded that the speculative nature of Petitioner's allegations did not overcome the strong presumption that counsel did not perform deficiently." (*Id.* at 19).

Petitioner's traverse fails to address this specific issue. (*See generally* Doc. 49). However, the subsequently admitted Cummings and West Declarations appear to be an attempt to provide factual support for Petitioner's claim. (*See* Docs. 50, 51). As Respondent argues, this Court's review is limited to the record before the state court. *Shoop v. Twyford*, 596 U.S. 811, 819 (2022) ("Review of factual determination under § 2254(d)(2) is expressly limited to 'the evidence presented in the State court proceedings.' And in *Cullen v. Pinholster*, we explained that review of legal claims under § 2254(d)(1) is also 'limited to the record that was before the state court.'") (citation omitted). When a petitioner fails to develop the factual basis of a claim in the state proceedings, a federal habeas court may admit new evidence only if (1) the claim relies on a new and previously unavailable rule of constitutional law made retroactively applicable by the United States Supreme Court or (2) relies on a factual predicate that could not have been previously discovered through the exercise of due diligence. *Id.*

Here, while Petitioner argues that the issue regarding counsel's failure to call witnesses was before the state court, he presents no argument that the Cummings and West Declarations were before the state court at any time.[7] Nor has Petitioner made any argument that he falls into one of the two narrow exceptions that would allow the Court to consider the Declarations. Thus, the Declarations are not properly before the Court.

---

[7] It seems unlikely Petitioner could raise any such argument in good faith given that the initial Declarations were undated and when they were resubmitted, they were dated May 2025, after the state proceedings concluded. (*See* Docs. 50, 51, 53, 55).

1    Turning to the merits of Petitioner's claim, Petitioner again cannot establish either prong

2    of the *Strickland* test.  "[C]ounsel's tactical decisions at trial, such as refraining from cross-

3    examining a particular witness or from asking a particular line of questions, are given great

4    deference and must similarly meet only objectively reasonable standards."  *Dows v. Wood*, 211

5    F.3d 480, 487 (9th Cir. 2000) (citing *Strickland*, 466 U.S. at 688-89).  The record reveals that

6    counsel cross examined every prosecution witness, highlighting one witness's willingness to talk

7    to the prosecution but not the defense as indicative of potential bias (Doc. 47-6 at 64-66), as well

8    as the relationships between the victims (*id.* at 138-40, 152-53, 196-97; Doc. 47-7 at 96-98, 109-

9    10), and generally attempting to discredit the victims recollection of events.  Defense counsel also

10   called witnesses on Petitioner's behalf to testify regarding Petitioner's character and Petitioner

11   testified, denying the allegations.  (Doc. 47-7 at 176-98).  There is no evidence to support that any

12   of counsel's decisions concerning the witnesses were unreasonable.  To the extent Petitioner

13   alleges counsel should have called additional witnesses, there is no evidence beyond Petitioner's

14   conclusory statements to support that these witnesses were available and willing to testify or what

15   their testimony would include.  *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (mere

16   speculation that an expert witness would have impacted jury's decision was insufficient to

17   establish prejudice under *Strickland*).  Thus, nothing in the record supports Petitioner's assertion

18   that counsel performed deficiently in representing Petitioner or that any alleged deficiency was

19   prejudicial.[8]

20   Because Petitioner has not shown either deficient performance or prejudice with respect to

21   counsel's handling of witnesses, he has not shown that the state court's rejection of this claim was

22   contrary to, or an unreasonable application of, Supreme Court precedent or based on an

23

---

24   [8] Even if the West and Cummings Declarations were properly before the Court, the undersigned concludes
     Petitioner still failed to establish deficient performance or prejudice.  The Cummings Declaration indicates

25   that Dan Cummings "would have provided as a direct witness alibi testimony several dates and incidences
     were false. The victim was not present at the alleged dates and times of the allegation as [Cummings] was

26   present." (Doc. 53).  Similarly, the West Declaration indicates Petitioner's wife would have testified that
     "the alleged dates and times the victims were not present at [her] home." (Doc. 55).  However, the victims

27   did not testify regarding specific dates, instead testifying to general date ranges when the specific events
     occurred, and detailed multiple occasions at multiple locations other than Petitioner's residence.  (*See, e.g.*,

28   Doc. 47-6 at 88-106).

1    unreasonable application of the facts.  Thus, he is not entitled to relief on this claim.

2    **D.  Conflict of Interest Indicated by Negative Comments**

3    Finally, Petitioner argues that counsel was ineffective because he had a "conflict of

4    interest," indicated by his negative statements to Petitioner's wife, including that she should sell

5    his property and move on.  (Doc. 38 at 103).

6    **1.  Background**

7    Petitioner raised a conflict of interest claim in his first state habeas petition, referencing

8    conversations between counsel and Petitioner's wife; Petitioner's brother's complainants to

9    counsel's supervisors; and counsel's work in a separate matter, *People v. Benton*, which involved

10    the family of one of the victims as a plaintiff.  (Doc. 47-10 at 4, 10).  The superior court denied

11    the petition, noting that Petitioner failed to demonstrate "that his attorney suffered from a conflict

12    of interest that had 'some palpable, real effect on the trial.'"  (Doc. 47-11 at 2 (quoting *People v.*

13    *Almanza*, 233 Cal. App. 4th 990, 1001-02 (2015))).  Additionally, the court noted that Petitioner

14    "failed to demonstrate that his criminal proceeding was adversely impacted by his attorney's

15    alleged … conflict of interest."  (*Id.* at 3).

16    **2.  Law and Analysis**

17    Respondent argues Petitioner's conflict of interest claim fails because the "only type of

18    trial-counsel conflict constitutionally prohibited in clearly established Supreme Court precedent is

19    concurrent representation of multiple defendants" and "Petitioner did not show, much less allege,

20    that counsel represented conflicting interests by way of multiple representation of defendants."

21    (Doc. 48 at 20).  Petitioner argues this is false because he argued in the trial court that he received

22    ineffective assistance because his counsel "represented a defendant who was charged with a crime

23    against the same family as petitioner."  (Doc. 49 at 3).  Specifically, Petitioner asserts that his trial

24    counsel represented Bryan Benton, who was accused of raping Petitioner's niece Melissa.  (*Id.*).

25    To the extent Petitioner challenges counsel's effectiveness based on counsel's alleged

26    comments, he seems to be alleging an irreconcilable conflict between himself and counsel.  The

27    Ninth Circuit has recognized that "to compel one charged with a grievous crime to undergo a trial

28    with the assistance of an attorney with whom he was become embroiled in irreconcilable conflict

1    is to deprive him of the effective assistance of any counsel whatsoever." *Carter v. Davis*, 946

2    F.3d 489, 507 (9th Cir. 2019).  However, "the Supreme Court has never endorsed this line of

3    precedent" and "has never held that an irreconcilable conflict with one's attorney constitutes a per

4    se denial of the right to effective counsel."  *Id.* at 508.  This lack of Supreme Court precedent is

5    fatal to Petitioner's claim on federal habeas review.  *Id.* at 508-09.

6         Petitioner's conflict claim based on counsel's alleged representation of an individual

7    accused of a separate crime fares no better.  As an initial matter, Petitioner failed to raise this

8    argument in these federal proceedings until his traverse, such that it is properly deemed waived.

9    *See United States v. Becerra*, 164 F.3d 631 (9th Cir. 1998) ("Claims raised for the first time in a

10   traverse brief are waived.") (unpublished) (citing *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507-

11   08 (9th Cir. 1994)).  Further, Petitioner's vague allegations regarding counsel's representation of

12   another defendant charged with crimes against a member of Petitioner's family[9] do nothing to

13   establish when this representation occurred, whether it was ongoing during Petitioner's case, or

14   how it impacted counsel's performance.  While "[c]onflicts of interest can arise from concurrent

15   representation of clients in separate matters," Petitioner must still show that his counsel actively

16   represented conflicting interests and was influenced in his basic strategic decisions by the

17   conflicted interests.  *Clark v. Chappell*, 936 F.3d 944, 986 (9th Cir. 2019).  Here, there is nothing

18   to support that counsel's alleged representation of the other defendant had any impact on his

19   representation or the result of the trial.

20        Accordingly, the state court's rejection of Petitioner's conflict of interest claim was not

21   contrary to, or based on an unreasonable application of, Supreme Court precedent or based on an

22   unreasonable determination of the facts.  Thus, Petitioner is not entitled to relief on his conflict

23   claim. Further, because Petitioner has not shown that he is entitled to relief on any of his

24   subclaims of ineffective assistance of counsel, the undersigned recommends that the Petition be

25   denied in its entirety.

26   ///

27

28   _____

[9] Notably, two of the victims in Petitioner's case were members of his own family such that it is not clear that counsel's representation of the other defendant would present any conflict.

1

## IV.    CERTIFICATE OF APPEALABILITY

"[A] state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his application." *Miller-El v. Cockell*, 537 U.S. 322, 335-36 (2003). Rule 11 of the Rules Governing § 2254 Cases requires a court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  A certificate of appealability will issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  To make this showing for claims rejected on procedural grounds, a movant must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of denial of a constitutional right and that jurists of reason would find it debatable whether the district was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  When a claim is rejected on the merits, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" to warrant a certificate of appealability.

Because Petitioner has not made a substantial showing of the denial of a constitutional right, the undersigned recommends that the court decline to issue a certificate of appealability.

## V.    RECOMMENDATION

For the reasons set forth above, it is **RECOMMENDED**:

1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. 38); and

2.  Petitioner be denied a certificate of appealability.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within **14 days** of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations" and **shall not exceed 15 pages** without leave of Court and good cause shown.  The Court will not consider exhibits attached to the Objections.  To the extent a party wishes to refer to any exhibit(s), the party should reference the

exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity.  Any pages filed in excess of the 15-page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **July 25, 2025**

UNITED STATES MAGISTRATE JUDGE